All rise. Okay, we'll now hear argument in Garcia versus West. You're here. Yes. Phone. I'm sorry. What? I thought we're going to have phone argument. Also, there's counsel on the phone. Yes. Okay. Can counsel on the phone hear us? Yes, Your Honor. Okay. You may proceed. May it please the court. My name is Stacia Sidlow and I, along with co-counsel Olton Doyle, represent appellant Ms. Sherry Garcia. As third-year law students at the University of Utah, Mr. Doyle and I are appearing pursuant to the third-year practice rule under the supervision of Professor John Turanian. We would like to reserve two minutes for rebuttal. I will be addressing Ms. Garcia's retaliation claim and Mr. Doyle will be addressing her gender discrimination and hostile work environment claims. This court should reverse the district court's order granting summary judgment in favor of the Army on Ms. Garcia's retaliation claim because she has more than established a prima facie case of retaliation and she should, therefore, be allowed to vindicate her rights in court. In determining whether the district court properly granted summary judgment, this court must construe the facts in a light most favorable to Ms. Garcia. The district court in this case erred by granting summary judgment to the Army because the evidence for a prima facie case of retaliation need only be minimal. In the words of this circuit, a plaintiff need only provide evidence that gives rise to an inference of unlawful discrimination. In this case, Ms. Garcia has raised far more than a mere inference of the three elements necessary to establish a prima facie case of retaliation under Title VII. First, it is undisputed that Ms. Garcia participated in a protected activity by filing an EEO complaint. Second, an adverse action was taken against her when a supervisor, Colonel Dale, a supervisor in her direct chain of command, effectively demoted her by transferring her to a position with significantly diminished responsibilities. And third, a causal link exists between her protected activity and the adverse employment action in that Colonel Dale threatened retaliation and immediately carried out that threat upon discovering that Ms. Garcia had filed an EEO complaint. What does effectively demoted mean? She was put into a position in which she essentially had... She testified in her deposition that she was left with nothing to do. That she offered... Did she ever cut her salary? They did not cut her salary. Did they reduce her in grade? They did not, but as this circuit has held, it is unnecessary for an employee to experience a decline in pay or benefit in order to have suffered an adverse employment action. Did she ask to be reassigned? She did not. She did not? No, I believe you're referring to... This is an October 17th email? Yes. That email was not a resignation or a request for reassignment. What does it say? Well, she did... Okay. Ms. Garcia, the day before, there's evidence showing that she had been removed from her position as Army DMS manager. My question was, what does the email say? The email says that... The email shows that she was merely... Just give us the words. What does the email say? Pull it out. Yes, read it to us. ER-171. Okay, it says, I am sending the email below, out at the end of the day, to the community I have worked with for so long. I thought it appropriate that I advise you of my intent before I do it. Not so that you can talk me out of sending it, but it must be done. I need to have some resolution with the people I have worked with. I was hired into SD specifically to be the Army DMS manager. With the passing of that function, I no longer have a job. Request reassignment to another project not associated with DMS. Yes, so she requested another assignment. Well, she did send the email to her supervisor, but she never sent the email out at the end of the day. I don't quite get that. This email was not received by Zundel I. Brown, ASSD? Yes, Mr. Zundel did receive the email, however... Who is Mr. Zundel? That is her immediate supervisor. And so she requested reassignment from her immediate supervisor. But it didn't go out to the supervisor, Colonel Dale, who is Mr. Zundel's immediate supervisor. It didn't go up the chain of command. Furthermore... What difference does that make if she requested it to her immediate supervisor? Well, as you can see in the email, it states that it was merely her intent before she does it. She didn't actually do it. Intent to do what? She did not actually resign. Well, no, she said intent to send this email to the community. So this answer to what she's saying is, I'm intending to send the email below letting people know that I resigned. But the operative language that goes to her supervisor is request reassignment to another project. Not I will request, not I plan to request, not I'm thinking about requesting. It says request. But the retaliatory action in this case is... I mean, even if you construe her email as a request for reassignment, the retaliatory action in this case occurred when Colonel Dale chose not to reassign her to a position of equality with similar duties. Instead, he chose to reassign her... What was the timing? So the email was on October 17th, 1995. Right. What was the sequence of events after that? On October 19th, she filed an EEL complaint. On October 20th, prior to finding out that she had filed the EEL complaint, Colonel Dale sent out an Army-wide email praising Ms. Garcia's work as Army DMS manager and stating she was being reassigned to work on other high-priority projects and issues. But when Colonel Dale discovered that she had filed the EEL complaint on October 29th, he stated, and I quote, And shortly thereafter, he reiterated that threat to Mr. Zundel and said that he wished that Ms. Garcia had not filed the EEL complaint because it was going to go badly for her, would not result in a positive action for her, and that ultimately the government, the Army, would prevail. And days later, Colonel Dale made sure that it went badly for her when within just a few days of her filing her EEL complaint, he chose not to put her in the position of high-priority projects and issues that he had indicated that he was going to do in his email. Was there any project particularly in mind? Did the email on the 20th refer to a specific project? She's assigned to a particular project, and then she was pulled off that? There's nothing in the record to suggest that. Is there any reason to believe that the memo on the 20th is more than a bunch of fluff, saying, oh, well, you know, she's being assigned, but don't worry, you know, she's going to be doing very important things? When you look at the two positions side by side, when you see what she was doing as Army DMS manager, I mean, she was traveling all over the world briefing high-ranking military officials and Department of Defense personnel. She participated in the monthly implementation group meetings at the Pentagon. She did many other very important and significant tasks. But when they put her into this position of project officer for the Army Signal Command, they essentially left her with nothing to do. That sounds like an important job, too. I'm sorry? That sounds like an important job, too. It sounds like an important job, but the record is undisputed that Ms. Garcia Doesn't like it. Not just that she doesn't like it. Of course she doesn't like it because she's left with nothing to do. I mean, the record is undisputed that she frequently spent her days playing solitaire because she had nothing to do. Is she getting paid the same? She is, but How many people is she managing? I don't believe she's managing any people at this point. Well, she's getting paid the same. Somebody in the military must think it's equivalent in terms of responsibility and importance. Well, I mean, they can call it important, but what really matters here is that, I mean, the project itself may have been important that they put her on, but She asked off of all the exciting stuff. You say she's not getting something that's equally exciting, but she asked off of it. She says, I want reassignment from Ms. Garcia. We do not believe that Ms. Garcia did request reassignment, so Well, I know you don't believe that, but assuming that we disagree with you on that if we read the e-mail literally, she says request reassignment to another project not associated with DMS. Yes, but because she didn't send that out at the end of the day, plus Colonel Dale had already Wait, she sent that to her supervisor. The bottom part, the e-mail below may have not been sent out, but the request for reassignment was to the supervisor. Well, Colonel Dale had already removed her from that position the day before, which was indicated in an e-mail that he sent to Mr. Zungel asking what was going to be done with her now that she was being taken off DMS. Furthermore, Well, yeah, but that e-mail was sent after she sent her. You're talking about the one later that day, October 17th, 4, 1 p.m.? No, there was one, there was an e-mail on the 16th, the day before, in which he, it was an e-mail to Mr. Zungel which stated that he was, it was something about an Army DMS expo and saying, wondering if she was going to be attending that now that she was being taken off DMS. So prior to her e-mail, she had already been removed, so she couldn't have resigned. I mean, she was already out of the, out of that position. She was already out of DMS? By the 16th. Where is that in the record? Okay. Okay. Okay, it's tab 29. It's an e-mail from Colonel Dale to Graham Zungel, which states that, What's the Bates stamp number? Oh, sorry, 167, which states that, I need to know if Sherry is going or if I need to get in touch with Lambeth and tell him no, that she's being taken off the DMS. So as of, Well, come on, counsel. Read that sentence again. Come on, just read it. I'm sorry? Read the sentence again. I need to know whether she is going or if I need to get in touch with Lambeth and tell him no, that she's being taken off. So, you know, he's asking, I need to know whether one is the case or the other. It's not saying she's being taken off. I need to know whether Sherry is going, which means she stays in the job, or whether she, I mean, this clearly doesn't say what you said, sir. There is other evidence to show that it is not a resignation. The day after the e-mail, her e-mail, the 17th, on the 18th. Actually, no. Resignation or reassignment? Either. Her resignation. We're not contending it was a resignation. Or a request for reassignment, for that matter. I see that my time is up for my portion of the argument. And so if there are no more questions, I would like to turn the time over to the co-counsel. Okay. Thank you. May it please the Court. My name is Alton Doughton. I also represent Helen Sherry Garcia. Today I'm going to be discussing Ms. Garcia's gender discrimination and hostile work environment claims. Ms. Garcia has produced sufficient evidence to establish each of the elements of a gender discrimination claim based on the fact that the Army removed her from the position of Army DMS manager and assigned her duties and responsibilities to Colonel Lambeth, a male employee. Well, he's a colonel, though. I mean, this is not a situation where they're taking one female and putting a male in the same position, a colonel position. They transferred it from a GS-13, which is a fairly lowly employee in the federal government, only two steps above our own law clerks in terms of rank. Yeah, when law clerks are one year out of law school, I mean, or just out of law school, so it's a pretty fairly low position to somebody who's a colonel. It's not a colonel. Somebody who must have been, to get to the rank of colonel, you're talking about somebody with probably 20 years of experience in the military. I don't see no problems. Your Honor, the record reflects that Colonel Lambeth was ranked as a GS-14. He was just one rank above Ms. Garcia and Ms. Garcia's son. Well, you can say that. We're ranked as three-and-a-half-star generals, but trust me, we can't direct the Army in Iraq. I wouldn't know what to do. So this equivalence ranking doesn't mean a thing. This is a military person, a career military person who's had many years of service, and I just don't see the equivalence. But there's no evidence to the record that any kind of military training or expertise was required to do the duties of Army DMS manager. Ms. Garcia had adequately, more than adequately, performed the job as a civilian employee for five years. Your normal sex discrimination case involves a situation where somebody gets fired from a position and somebody else gets hired in the same position of different sex or race or whatever, or where somebody gets transferred out and somebody in the same or somewhat similar or less experience gets put in and they turn out to be different races. But this is sort of an apples and oranges thing. I mean, she's a fairly mid-level civilian employee, and she gets replaced with an Army colonel. I just don't see the equivalence. Again, Your Honor, under the standard of question, in order to defeat a motion for summary judgment, Ms. Garcia only has to raise an inference that she and Colonel Lambeth were similarly situated. With respect to the difference in rank, it's important to note that Mr. Zundel, Ms. Garcia's supervisor, indicated that she was performing at a level of a GS-14 or even a GS-15. They both worked in the DMS program. She was the Army DMS manager and he was the Army DMS program manager, and they both ultimately reported to Colonel Dale. All of these factors are sufficient to create an inference that she and Colonel Lambeth were similarly situated, and that is all that Ms. Garcia needs to do in order to defeat the Army's motion for summary judgment. This evidence, I believe, is sufficient to raise such an inference. It's undisputed that Ms. Garcia was a member of her protected class and that she was qualified for the position of Army DMS manager. Ms. Garcia has also demonstrated – She didn't resign, though, right? No, she – According to that e-mail. And I'd be happy to address that. And she does not raise constructive discharge. It wasn't raised as a claim in her EEO charge. And she's not – we're not arguing that she was constructively discharged. If we read the e-mail as a resignation, we might not, but let's say we look at the e-mail as a resignation. What case have you got left? She says, move me out of here. Your Honor, when Colonel Dale received – what happened was Mr. Zondel forwarded that e-mail to Colonel Dale. When he received the e-mail, he responded by announcing that, quote, this is not a resignation and that he was going to be reassigning her. I understand, but what you're doing is you're arguing that we ought not to read this as a resignation. You can do that, but you've got two minutes and eight seconds left. And the question I would like you to answer, if you choose, is assume that we're going to read that as a resignation, okay? Just for purpose of getting us to that point in the discussion. It doesn't mean we will. It just means that that's what I want you to address. So assume that we look at that e-mail and we treat it as a resignation, okay? What's left of your case? If she – well, at that point – We call it a resignation. She asked for a transfer. She said, get me out of here. First of all, what I would say, the very fact that you and I are going back and forth right now is evidence that this is a disputed fact and should be resolved by a jury, but – What is? The very fact that there's some ambiguity in the e-mail. There's some ambiguity as to whether she's – You're continuing to argue the point that I told you to assume. Okay. If you want to, you go down to a minute and 30 seconds. What I would argue then, Your Honor, is given the fact that Colonel Lambeth basically usurped Ms. Garcia's position, that this – if we assume, and I don't concede it, but if we do assume that this was a resignation, I would argue that that then amounts to a constructive discharge. But you yourself have said just a minute ago you're not arguing constructive discharge. You didn't raise constructive – I don't – You didn't raise constructive discharge in your EEO charge, so it doesn't exist. It's a good theory, but wait. But again, Your Honor, I would say that there's sufficient evidence to indicate that this was not a resignation. I understand. So what you're really saying, standing there sort of not spending the time, what you're saying is you have no answer. If it is a resignation, that is the end of your case. You don't have a backup argument. Other than she was – other than I would say that her – the experience that she was – or the frustration she was experiencing with the military essentially forced her to resign. Right. Constructive discharge, which is the thing you said you're not arguing. Talk to me about hostile environment. Was that included in the EEO charge? What Ms. Garcia did raise in the EEO charge was she addressed some – How about starting with a yes or no? What's that? Was it in the EEO charge? She didn't actually specifically – What does actually and specifically mean? She did not specifically raise – Not raise it. She did not raise it in – Isn't that jurisdictionally – which are like or reasonably related to the claims raised in an EEO charge. And significantly, the district court, in its original order from July of 1999, noted that Ms. Garcia had raised sufficient facts in both her EEO complaint and in her amended judicial complaint to state a claim for a hostile work environment. In the order in which they dismissed the claim, the district court never actually addressed its previous order and totally ignored and contradicted that particular order. Okay. Thank you. We'll hear from another side. Good morning. May it please the court. I'm Assistant United States Attorney Donna Ford, and I represent the defendant aptly in this matter. I first, before I begin, want to thank the court for allowing me to appear telephonically for this argument. It was very considerate, and I certainly do appreciate it. No problem. Going to the merits of the case, the aptly requests that this court affirm the district court decision granting summary judgment. I'd like at the outset to give some background for the court to clarify a few points with respect to the DMS project and the DMS positions, regarding specifically the program manager or PM position and the project coordinator position. There is testimony by way of affidavit and deposition from a number of people, Mr. Zundel, General Sutton, and even the plaintiff herself, that this time period in question, which was the fall of 1995, was a time of flux or upheaval and reorganization at Fort Huachuca, specifically with regard to the DMS program. Eventually, within the next six to nine months, Fort Huachuca would lose command oversight for DMS. They went from a major army command to a subordinate command. Mr. Zundel talks about this reorganization and restructure on page 172 of aptly's excerpts. At the same time, the DMS project had grown and had become a major project for all of the services. DMS was allocated funds and each of the military services began appointing PMs or program managers. I'd like to point the court specifically to Mr. Clark's affidavit, which is on page 65 of the aptly's excerpts. Mr. Clark talks about the initiation of the recommendation to establish a PM position or a program manager position. Up to that point, the Army did not have a program manager. Mr. Clark testifies that the Navy, the Air Force, and the Marine Corps all had program managers assigned to their projects, but that the Army was still working with a program coordinator. That program coordinator was Ms. Garcia. Mr. Clark specifically points out in his declaration that he was pleased with Ms. Garcia's duty and her performance as the project coordinator, but that the Army needed, because of the breadth of the program, the Army really needed a PM. Mr. Clark then recommended to Lieutenant General Gunther that the Army appoint a PM. Then if we look at the testimony of General Sutton, starting on page 118 of the aptly's excerpts, General Sutton describes how together with Lieutenant General Gunther and General White, the decision was made at the Pentagon at very high levels that the Army should appoint a program manager. General Sutton goes on to discuss that the decision was made that this should be a colonel and that he should be acquisition certified. There's a lot of discussion by General Sutton in the record as to what acquisition certified means. It involves years and years of training and experience in order to be a member of the acquisitions corps. General Sutton specifically goes through that on page... Acquisitions is basically procurement. The way General Sutton describes it, it's pursuant to the Goldwater-Nichols Act of 1986. Congress basically professionalized the procurement and acquisition of items in the Defense Department. There was a specific program that these people had to go through. An acquisitions officer would start at the major level. The officer goes through a series of schools and becomes a deputy project manager. That was actually Mr. Sepka's level. Mr. Sepka was a GS-14 on the civilian scale, and that would have been the equivalent of the major going through the acquisition certification program. Then at the lieutenant colonel level, a selection board places the officer in a deputy project manager position. The officer is then reviewed, and the officer competes for the next level. According to the testimony of General Sutton, basically one-third of the officers competing make it to the next level. So it's very competitive. At the full colonel level, they operate for at least two years in a program manager position, and then they're selected to go into the corps. So it's a very structured and onerous program in order to become acquisition certified. And that's only open to uniformed officers? I don't believe it is, Your Honor. It's not specifically explained in the record, but according to Mr. Clark's declaration, he was actually the program manager for DOD, or the Department of Defense. I see. So one could be a civilian programmer and be part of this corps? Yes, it appears that way from the record, Your Honor. It appears that Mr. Clark is actually a PM, and that Mr. Sepka has the equivalency of a deputy PM at the major level, at the beginning levels of going through the corps training. And tell me again, when was the decision made to raise this position to the program manager level? This decision was made in the summer of 1995. Mr. Michelli actually made the appointment. His declaration is on page 66. The memo establishing... Excuse me, this is Bates Stamp 66? Yes, Bates Stamp 66 in the government's excerpts. Okay, hold on. I want to get there. Bates? Oh, no, there are no Bates Stamp. The bottom numbers. Hold on. 66, I'm with you. Declaration of Thomas J. Michelli. Michelli, okay. Okay, he talks, first of all, about... Remind me again, who is he? He is actually the director of the Army Information Systems Management Activity, and he had responsibility. In other words, the PM reported to him. The program manager? The program manager reported to Mr. Michelli, that's correct. Okay. Mr. Michelli actually established the program manager office, and the memo that went out establishing that office is page 69, which was attached to his declaration. That was done September 18, 1995. That's the date of this memo. He explains in there that General Sutton and General Gunther recognized the need for a program manager under DMS, and in order to meet that challenge, he initiated the request to formally establish a PM DMS. Pending that request, he says in paragraph 2, he established a provisional DMS management office. Effective September 11, 1995, which would port directly to him. In that office, he placed Colonel Lambeth as a provisional PM. So Colonel Lambeth actually, as explained in Mr. Michelli's deposition, was a colonel coming out of a PM job. He needed another PM job. He was going to retire in approximately eight or nine months, and Mr. Michelli had a PM job that needed a colonel. And so they placed Colonel Lambeth in that position temporarily until the board could appoint a permanent PM. As Mr. Michelli points out in his declaration, only the board can appoint a PM. And so once they did appoint a PM, that PM became effective on the date of Colonel Lambeth's retirement, which was the following July, I believe, 1996. Now, none of these decisions were made, and there is absolutely no evidence in the record to prove that any decision was made because of the plaintiff's gender or because of the plaintiff's job performance. In fact, throughout the record, plaintiff was praised for her performance and for her work as the DMS project manager at Fort Huachuca. What is in the record is the plaintiff's resignation email, and also in the record is the testimony of Mr. Zundel. His declaration appears, I believe it starts at page 172 of the government's excerpts. And on page 174 specifically, he describes a meeting that he had with Ms. Garcia, explaining to her the fact that there was a reorganization in the command and that the command at Fort Huachuca would, in a matter of months, lose all command oversight over the project, over the DMS project, and that there was a decision made that it would just be inappropriate to continue battling with Colonel Lambeth over the duties and responsibilities in the program. The command at Fort Huachuca tried to retain what they could of the coordinator position, but he explained to Ms. Garcia that it would be in a somewhat reduced capacity, although that reduction in duties and responsibilities was not yet determined and they were still negotiating or discussing with Colonel Lambeth what the duties would be. Mr. Zundel explains that he sat down and he gave the plaintiff, gave Ms. Garcia, two options. He said you can stay in the coordinating position with some reduced responsibilities and duties, or she could choose to be reassigned to another project. And he says he told her to take some time in thinking about it, and she just said, I don't need to think about it, and she fired off that October 17th email. Well, that helps explain some of the language in the October 17th email, where she says, with the passing of that function. That's correct. Earlier she says, I was hired in the SD specifically to be the Army DMS manager. With the passing of that function, I no longer have a job. So she's acknowledging there that there's a reorganization, and she mentions that down. As the Army works through its reorganization, I'm sure you'll be notified what the new Army management structure will look like. So you say all of this that you've been telling us about illuminates what she says when she talks about passing of that function, new Army management structure and reorganization. That's correct. So it's the reorganization that took her out of her job. That's right. Okay. The whole crux of this case is the fact that the Army was reorganizing, and eventually there would actually be no longer a DMS project coordinator position per se at Fort Huachuca. With the passing of that function. Right. That's basically the entire case, Your Honor. It also relates to the appellant's claim or argument that after her reassignment, she was not given the same duties or functions. There are two points to that. One is that there no longer was a DMS project coordinator position, and the second is that there were no other assignments with the visibility of that actual project. Mr. Zundel discusses her assignment in his declaration on page 175. He specifically says even though the SOMA project, which is the project that the plaintiff was then assigned to, was not as visible as DMS, it was still an important project for reasons that he mentioned earlier in his declaration. Now, the reason he uses the word visible is because the DMS program was a high-visibility, high-profile type of project. There were no other projects of that visibility at Fort Huachuca at that time. The significance of that is that, number one, the plaintiff in the district court did not submit any evidence to show, number one, what project could she have been assigned to, what projects were there that she would have wanted to be assigned to, or what projects did other people in her group have that could have been the equivalent of DMS that she didn't get. She didn't submit any evidence to those facts because there simply was no evidence of any of that. What is in the record is that she was assigned to an important project, the SOMA project, and that there was nothing else as visible as DMS. And that is the simple answer to her retaliation claim. If the court has any questions, I'd like to answer questions. Otherwise... I think there are not. Okay. Thank you so much. Okay. The government then, via police, simply requests that this court affirm the decision of the district court, granting summary judgment in its favor. Okay. Thank you. Okay. You are out of time, but I'll give you each a minute for rebuttal if you choose to take it. Your Honor, if I may do the entire rebuttal, and I will try to be as brief as possible. First of all, with respect to the position of Army DMS manager and the program manager positions, the Army seems to suggest that as of June, as of the summer of 1995, that the DMS manager position was going to be somehow eradicated or phased out. When Colonel Dale... Says that herself, with the passing of that function, I no longer have a job. Well, when Colonel Dale threw up the job descriptions of both the program manager position and of the Army DMS manager position, he specifically notes the two functions, and there's nothing in his proposal that indicates that this was to be phased out. This is as of June of 1995. If you refer to page or, sorry, to tab 16, 447, you'll see that the two tasks are outlined as of June of 1995, and there's nothing, no evidence whatsoever to indicate that this position was going to be phased out. June is not quite summer. I thought these changes happened in August. Well, June of 1995 is when the program manager position was drawn up and Colonel Lambeth was going to be the provisional program manager, and there are two separate positions listed as of that time. And also, if I may quickly just revisit the... Well, what does she mean then? I hate to keep going back to this. With the passing of that function, I no longer have a job. What she meant was that Colonel Lambeth, who was assigned the PM position, basically stepped in, took over her job function. She was the focal point of the Army, was representing the Army at high-level meetings at the Pentagon. Colonel Lambeth took it upon himself to step in and take over these tasks, and the Army did absolutely nothing to prevent that. She says here, too, that the Army is involved in a reorganization, and I'm sure you'll be notified what the new Army management structure will look like. But that's her expressing her frustration as what she saw was her duties being taken away from her, but there was never any command or anything like that to suggest that this position should be phased out. But Colonel Lambeth took it upon himself to do this, and that e-mail on the 17th, it's not a resignation. It's her intent to resign, and I don't see how the Army can argue that it's a resignation when Colonel Dale himself, when he got that e-mail, announced it is not a resignation. I believe that in light of the evidence in this case, that there is sufficient evidence to prove the retaliation claim, the hostile work environment claim, and Ms. Garcia's gender discrimination claim. Okay, thank you. Cassius, you will stand submitted.
judges: B. Fletcher, Kozinski, Trott